**EXHIBIT 1**

**<u>AFFIDAVIT OF SPECIAL AGENT JEFFREY COMMANDER</u>**

I, Jeffrey Commander, Special Agent of the United States Drug Enforcement Agency, being duly sworn, depose and state as follows:

1. I am a Special Agent with the United States Drug Enforcement Administration ("DEA"). I joined the DEA in August 2005 and have received specialized law enforcement training. Upon completion of my training, I was assigned to the DEA Boston field office in January 2006. I have been involved in at least fifteen narcotics investigations involving the use of various investigative techniques, including controlled purchases of narcotics, the use of confidential informants and other cooperators, and physical surveillance. I have also been involved in financial investigations, including investigations targeting "bulk cash" smuggling.

2. Based upon my training and experience with large scale marijuana transportation organizations, I have identified several patterns these organizations use to transport narcotics and/or proceeds trans-regionally. Typically, the organizations will receive marijuana from sources of supply from Canada or Mexico or from "home grows" within the United States and transport these marijuana loads to urban areas within an established customer base using trucks and/or trailers. Usually, the marijuana is then transported and parceled out to other large customers. During this distribution process, members of the organization typically utilize common hotels in and around the area of

distribution while proceeds from the marijuana loads are brought back to the supplier.  It is common for the "facilitator" or "controller" of the marijuana load to wait until this illicit collection is complete.  Upon completion, the facilitator will store the bulk currency in a conveyance and transport it back to higher members of the organization.

    3.    I am familiar with the circumstances of the offenses described in this Affidavit.  This Affidavit is based upon my personal knowledge and personal surveillance as well as information communicated to me by witnesses or others participating in the investigation, as well as on my review and analysis of reports and other documentary evidence.

    4.    I submit this affidavit in support of a complaint for civil forfeiture against the following property:

> $572,204.00 in United States currency seized on December 13, 2006 in Weston, Massachusetts (the "Defendant Currency").

    5.    This affidavit is being submitted for the limited purpose of establishing probable cause in support of the attached verified complaint for forfeiture <u>in</u> <u>rem</u>.  In light of the limited purpose for which this Affidavit is being submitted, I have not included each and every fact known to me concerning this investigation.

    6.    As described in more detail below, I have probable cause to believe that the Defendant Currency is subject to seizure and forfeiture pursuant to 21 U.S.C. § 881(a)(6) and § 881(b) because it represents moneys, negotiable instruments,

securities, or other things of value furnished or intended to be furnished by any person in exchange for a controlled substance or listed chemical in violation of 21 U.S.C. Section § 801, et seq. (the "Controlled Substance Act"), proceeds traceable to such an exchange, and/or moneys, negotiable instruments, and securities used or intended to be used to facilitate any violation of the Controlled Substance Act.

### Investigation

7.  On December 12 and 13, 2006, members of DEA Task Force 2 and the Massachusetts State Police ("MSP") Essex County Drug Unit conducted surveillance on the Hampton Inn Hotel ("Hotel") located at 215 Wood Road, Braintree, Massachusetts. As set forth in more detail below, the surveillance resulted in the seizure of $572,204 in United States Currency in Weston, Massachusetts.

8.  On December 12, 2006, at approximately 1:30 p.m., surveillance officers saw a white male ("UM1") speaking on a cell phone in the rear of the Hotel parking lot. UM1 was standing next to a white 2003 F-250 King Ranch pick-up truck (the "Truck") that had an attached white 1998 Sooner horse trailer (the "Trailer") bearing Colorado plate numbers 531IBA and 707LLT respectively. A query with the Colorado Department of Motor Vehicles indicated that the Truck and Trailer were both registered to Winston Conkling ("Conkling").

9.  Shortly thereafter, officers observed a U-Haul truck being driven by a second white male ("UM2"), and bearing Arizona plate number AB96781, pull up next to UM1. At this time, UM1

entered the U-Haul which then departed the Hotel parking lot. Surveillance was maintained on the U-Haul while it traveled northbound on Route 93 toward Boston, Massachusetts. Surveillance was then terminated.

10. A query with the U-Haul company by the MSP Essex County Drug Unit indicated that the U-Haul truck was rented out of Colorado by James Maliawco ("Maliawco") and Corey Young ("Young").

11. Surveillance was reestablished at the Hotel on December 13, 2006, and at approximately 9:40 a.m., a light grey 2006 Lincoln Navigator (the "Navigator") bearing Massachusetts plate number 48EN51 pulled into the Hotel parking lot. A query with the Massachusetts Registry of Motor Vehicles indicated that the Navigator was owned by Hertz rental and a subsequent query with Hertz determined that the Navigator had been rented by Adam Koenigsberg ("Koenigsberg"). A short time later, a white male, later identified as Koenigsberg, got out of the Navigator carrying a duffel bag and entered the Hotel. Approximately four minutes later, Koenigsberg left the Hotel carrying the same duffel bag and departed the parking lot in the Navigator.

12. A criminal records history check shows that Koenigsberg was convicted in the Concord Massachusetts District Court in 1990 of manufacturing marijuana, a Class D substance. He was again convicted in the Concord Massachusetts District Court of possession of marijuana on two separate occasions in 1989. He was also convicted of possession of dangerous drugs in

Boulder, Colorado in 1994, and was charged with possession/distribution of marijuana in Arvada, Colorado in 2001.

13. Shortly after Koenigsberg left the Hotel, surveillance agents interviewed Hotel management personnel as to the nature of Koenigsberg's visit and also asked if Conkling was registered at the Hotel. According to Hotel management personnel, Conkling paid cash for two rooms. Room 428 was assigned on December 12, 2006 at 2:55 a.m. and checked out of on December 12, 2006 at 2:03 p.m. Room 422 was assigned on December 12, 2006 at 12:06 p.m. Hotel management personnel also stated that Koenigsberg used the house phone to call room 422 but no one answered. At that point, the Hotel clerk called room 422 and also received no answer.

14. At approximately 12:00 p.m., surveillance agents again interviewed Hotel management personnel to inquire about the status of room 422. According to Hotel management personnel, the occupants of room 422 were due to check out at noon on December 13, 2006 and had not yet done so. Hotel management personnel also indicated that the room appeared clean and unused, and they were concerned about Conkling's Truck and Trailer still parked in the rear of the Hotel parking lot.

15. Surveillance of the Hotel continued. At approximately 12:40 p.m., a 1997 Land Rover (the "Land Rover") bearing Massachusetts plate number ICAB55 pulled alongside the Truck. A query with the Massachusetts Registry of Motor Vehicles indicated that the Land Rover was registered to Maliawco. Officers saw a white male, later identified as Maliawco, driving the Land Rover

with another white male, later identified as Young, in the passenger seat. Maliawco and Young got out of the Land Rover carrying two or three duffel bags. Maliawco and Young opened a door to the Trailer and placed the bags inside.

16. At approximately 1:18 p.m., the Navigator entered the Hotel parking lot and pulled up next to the Truck and Trailer in the rear of the lot. Surveillance agents observed Koenigsberg get out of the Navigator and hand Maliawco a duffel bag, and saw Maliawco place the bag inside of the Trailer. Approximately two minutes later, the Navigator left the Hotel parking lot.

17. At approximately 2:32 p.m., the Truck and the Land Rover departed the Hotel lot. A short time later, the Truck returned to the lot and then departed with the Trailer in tow.

18. Based on my training and experience, as described particularly in paragraph 2, <u>supra</u>, the conduct of Young, Maliawco, and Koenigsberg discussed above is consistent with the distribution of controlled substances and the collection of proceeds from controlled substances.

19. At approximately 2:45 p.m., the Truck and Trailer were observed in the South Shore Shopping Mall rear parking lot in Braintree, Massachusetts. The Truck then pulled away from the Trailer and entered the lot of Sullivan Tire located in the South Shore Mall parking lot.

20. Surveillance of the Trailer was maintained until the Truck returned from Sullivan Tire at approximately 5:22 p.m. and backed in front of the Trailer. Young got out of the Truck and

attached the Trailer to it.  The Truck and Trailer then departed from the South Shore Mall lot.

21.  Surveillance was maintained on the Truck and Trailer after leaving the South Shore Mall lot until they were pulled over on Route I-90 in Weston, Massachusetts, at approximately 6:07 p.m., for a marked lane violation by MSP Trooper Charles Kane.  Young was the only occupant in the Truck.  Young told Trooper Kane that he was weaving because the Trailer was so big.

22.  Trooper Kane observed that Young was very nervous and that his hands were shaking.  Trooper Kane asked Young why there were no horses in the Trailer.  Young stated that his friend dropped the horses off in Boston, Massachusetts, but Young did not know where the horses went.  Young stated that he flew into Boston two days ago (December 11, 2006) to drive the Truck and Trailer back to Colorado.  However, Young showed Trooper Kane a plane ticket that was dated December 12, 2006.

23.  Trooper Kane asked Young for his social security number.  Young appeared nervous and stated "this is getting bad".  Trooper Kane asked Young to step out of the Truck.  Young stepped out of the Truck and appeared very nervous.  Trooper Kane asked Young whether there was anything in the Trailer.  Young said he did not know but said it was his boss, "Bill's", trailer.  Young stated, "Bill flew back to Colorado from Boston."  Young told Trooper Kane that he stayed at the Omni Parker House Hotel while he was in Boston.

24.  Trooper Kane asked Young about a side door on the aft

cab section of the Trailer which had two locks.  Young became very nervous when this side door was approached.  **Young told** Trooper Kane that he did not have the keys to the locks on this door.  When Trooper Kane attempted to open this door, Young stretched his arms as though he was nervous and said "Oh (expletive), this is bad."  Trooper Kane then told Young that he appeared very nervous.  Young admitted to Trooper Kane that he was nervous.

    25.  Trooper Kane removed his trained K-9, Riggs, from his patrol car and led Riggs around the Truck and Trailer.[1]  Riggs immediately alerted to the side door of the Trailer that had two locks.  Trooper Kane and MSP Trooper Thomas Duane then opened this door with a crowbar.  Just inside the door they found two black duffle bags and a shoe box, each of which contained a large sum of United States currency, later determined to be $572,204 in United States currency (i.e., the Defendant Currency).  Trooper Kane stepped inside of the aft cab and noticed that the carpet was saturated with oil and also noticed that a window at the back and a vent at the side were both sealed shut with duct tape.  Trooper Kane also found an empty large green duffle bag and two

---

[1] The K-9, Riggs, is an eight year old Chez German Shepard that was first certified in narcotics in April 2002 under the New England State Police Administrative Consortium (N.E.S.P.A.C.) standards following a six week training school.  Riggs is maintenance-trained monthly and has been re-certified annually under the same standards since 2002.  Riggs has successfully found narcotics numerous times with exterior alerts over the past five years.  On several occasions Riggs has alerted to narcotic odor and large amounts of U.S. currency have been located.

empty large red duffle bags, all with marijuana residue.

    26. Trooper Kane informed Young about the money. Young responded, "I'm pissed at Jim and Bill." Young told Trooper Kane that the money must be from the horses that they sold. Young signed a form in the presence of Trooper Kane denying ownership of the Defendant Currency.

    27. Young provided Trooper Kane with a cellular phone number for the owner of the Truck and Trailer, Conkling, whom he had previously referred to as Bill. A criminal history check shows that Conkling was arrested for drug offenses in 1997 and 2001. Trooper Kane called the number and asked for Conkling. When Conkling responded, Trooper Kane identified himself and explained that he had seized money from the Truck and Trailer. Conkling hung up on Trooper Kane. Trooper Kane then called back and again spoke to Conkling. Trooper Kane overheard Conkling say "Jim, hold on a minute, they got the truck." Conkling then told Trooper Kane that he was in a bad area and hung up the phone. Trooper Kane continued to call this number but received no answer.

    28. As a result of this stop, the Defendant Currency found inside the double locked side door of the Trailer was seized by MSP, who subsequently turned it over to the DEA.

    29. Based upon the facts stated above, I have probable cause to believe that the Defendant Currency represents moneys, negotiable instruments, securities, or other things of value furnished or intended to be furnished by any person in exchange

for a controlled substance or listed chemical in violation of the federal drug laws, is proceeds traceable to such an exchange, and/or is used or intended to be used to facilitate a violation of the federal drug laws.  There is therefore probable cause to believe that the Defendant Currency is forfeitable to the United States of America pursuant to 21 U.S.C. § 881(a)(6).

    Signed under the penalties of perjury this __28__ day of __JUNE__, 2007.

                                                        _____
                                                    Jeffrey Commander, Special Agent
                                                    United States Drug Enforcement Administration